DENNIS RICE and HAROLD MACARIOLA, )
individually and on behalf of all others similarly )
situated, )    Case No. 10-CV-0294-CVE-FHM
                                        ) <u>BASE FILE</u>
           Consolidated )
           Plaintiffs, )    Consolidated with
                                         ) Case No. 10-CV-0311-CVE-FHM
          v. )
                                         )
DOLLAR THRIFTY AUTOMOTIVE GROUP, )
INC., THOMAS P. CAPO, MARY ANN N. )
KELLER, EDWARD C. LUMLEY, RICHARD )
W. NEU, JOHN C. POPE, SCOTT L. )
THOMPSON, HDTMS, INC. and HERTZ )
GLOBAL HOLDINGS, INC., )
                                         )
           Defendants. )

**DECLARATION OF JACK C. MOORE IN SUPPORT OF PLAINTIFFS'**
**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO**
**DISMISS THE JOINT AMENDED CLASS ACTION COMPLAINT**

I, Jack C. Moore, declare, under penalty of perjury, the following:

1.    I am a partner at the law firm of Hartman, Blackstock & Moore, counsel for Plaintiffs in the above-referenced action. I submit this Declaration in support of Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss the Joint Amended Class Action Complaint.

2.    Attached hereto as Exhibit A is a true and correct copy of the *In re Zenith Nat'l Ins. Corp. S'holders' Litig.,* Del. Ch., No. 5296-VCL, March 19, 2010, hearing transcript of the "Telephonic Oral Argument On Plaintiffs' Motion For Expedited Proceedings and Rulings of the Court."

I hereby declare under penalty of perjury that the foregoing is true and correct this 5th day of August, 2010.

_s/ Jack C. Moore_____
JACK C. MOORE

4832-6568-8839, v. 1

# EXHIBIT A

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE:  ZENITH NATIONAL INSURANCE CORP.: Consolidated
SHAREHOLDERS LITIGATION                : Civil Action
                                       : No. 5296-VCL

- - -

Chancery Court Chambers
New Castle County Courthouse
500 North King Street
Wilmington, Delaware
Friday, March 19, 2010
12:03 p.m.

- - -

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.

- - -

TELEPHONIC ORAL ARGUMENT ON PLAINTIFFS' MOTION FOR
EXPEDITED PROCEEDINGS and RULINGS OF THE COURT

- - -

--------------------------------------------------------
CHANCERY COURT REPORTERS
New Castle County Courthouse
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0524

```
 1    APPEARANCES:  (via speakerphone)

 2         CARMELLA P. KEENER, ESQ.
           P. BRADFORD deLEEUW, ESQ.
 3         Rosenthal, Monhait & Goddess, P.A.
                        -and-
 4         JAMES S. NOTIS, ESQ.
           of the New Jersey Bar
 5         Gardy & Notis, LLP
                        -and-
 6         DAVID H. LEVENTHAL, ESQ.
           of the New York Bar
 7         Faruqi & Faruqi, LLP
                        -and-
 8         LESTER R. HOOKER, ESQ.
           of the Florida Bar
 9         Saxena White P.A.
              for Plaintiffs
10
           ALLEN M. TERRELL, JR., ESQ.
11         ETHAN A. SHANER, ESQ.
           Richards, Layton & Finger, P.A.
12                      -and-
           ROBERT C. MYERS, ESQ.
13         JOHN E. SCHREIBER, ESQ.
           JAMES P. SMITH III, ESQ.
14         of the New York Bar
           Dewey LeBoeuf LLP
15            for Defendants Zenith National Insurance Corp.,
              Stanley R. Zax, Jerome L. Coben, Max M.
16            Kampelman, Robert J. Miller, Fabian Nunez,
              Catherine B. Reynolds, Alan I. Rothenberg,
17            William S. Sessions, and Michael W. Zavis

18         WILLIAM M. LAFFERTY, ESQ.
           BRADLEY D. SORRELS, ESQ.
19         Morris, Nichols, Arsht & Tunnell LLP
                        -and-
20         ALAN S. GOUDISS, ESQ.
           of the New York Bar
21         Shearman & Sterling LLP
              for Defendants Fairfax Financial Holdings
22            Limited and Fairfax Investments II USA Corp.

23                           -  -  -

24
```

1                    THE COURT:  That is Travis Laster
2    speaking.
3                    MS. KEENER:  Good afternoon, Your
4    Honor.  This is Carmella Keener.  And there are a
5    number of other attorneys on the phone.  Would Your
6    Honor like a roll call?
7                    THE COURT:  Yes, please.
8                    MS. KEENER:  On behalf of plaintiffs,
9    Carmella Keener of Rosenthal, Monhait & Goddess, and
10   my colleague, P. Bradford deLeeuw.  My cocounsel are
11   also on the line, James Notis of Gardy & Notis; David
12   Leventhal of Faruqi & Faruqi; and Lester Hooker of
13   Saxena White.
14                   THE COURT:  Who's going to be speaking
15   for your side this morning?
16                   MS. KEENER:  Your Honor, both
17   Mr. Notis and Mr. Leventhal has been admitted pro hac
18   vice.  And depending on what Your Honor's inquiries
19   are, either one of them may -- will be available to
20   respond.
21                   THE COURT:  Thank you.
22                   Who else do we have?
23                   MR. TERRELL:  Your Honor, for Zenith,
24   this is Allen Terrell and Ethan Shaner of Richards,

1   Layton & Finger.  And I have my cocounsel with Dewey

2   LeBoeuf, Bob Myers, John Schreiber, and Jim Smith.  I

3   will be speaking on behalf of Zenith, Your Honor.

4                   THE COURT:  Thank you.

5                   MR. LAFFERTY:  And, Your Honor, this

6   is Bill Lafferty of Morris Nichols.  I represent the

7   Fairfax entities.  And my colleague, Brad Sorrels is

8   in my office; and my cocounsel, Allen Goudiss from

9   Shearman & Sterling in New York is also on the line.

10                  THE COURT:  Great.  Well, with that,

11  then, since we're here on plaintiffs' motion to

12  expedite, why don't the plaintiffs kick off.

13                  MR. LEVENTHAL:  Good morning, Your

14  Honor.  David Leventhal -- or good afternoon.  David

15  Leventhal for the plaintiffs.

16                  After reading the preliminary proxy,

17  plaintiffs have various concerns regarding process and

18  disclosures.  Specifically regarding process, it

19  appears to us that Mr. Zax, CEO and chairman of the

20  board, made the deal a fait accompli.  He completely

21  negotiated the deal with Fairfax, which was then

22  essentially rubber-stamped by the -- the outside --

23  excuse me; the independent directors.

24                  We have concerns in this case.

Mr. Zax was advised by -- by Bank America, Merrill
Lynch, who has had, as disclosed, substantial -- we're
advised over the past two years -- excuse me; had been
advising Fairfax over the past two years in a -- in a
number of significant transactions, one transaction
closing about three months before, involving Fairfax's
acquisition of the Odyssey company.  I believe that
was a billion-dollar transaction.

One of the disclosure points that
plaintiffs are seeking is a disclosure of the exact
fees that Merrill Lynch had been billed by Fairfax, to
get a better sense of the nature of that conflict.

Looking at the -- the proxy, there's a
glaring hole in that the -- the proxy fails to
disclose the projections that Merrill Lynch used in
conducting its discounted dividend analysis.  In a
unique situation here, over 99 percent of the public
float of this company is held by institutional
investors and mutual funds.  And these are the very
type of investors who would be very interested in
seeing those projections and doing their own
discounted dividend analysis.

The -- the analysis done by Merrill
Lynch and disclosed in the proxy is very brief.  It's

1  barely three and a half pages.  And, clearly,

2  investors are not being able to -- given enough

3  information to adequately understand their rights,

4  whether to vote in favor of the transaction or to seek

5  appraisal.

6          Additionally, another disclosure  --

7  and I would just note that we did not seek to give

8  Your Honor a laundry list of disclosures.  We picked

9  the core disclosures that we think shareholders need

10 to know to make informed decisions.

11          Merrill Lynch did disclose that they

12 did analysis based on implied equity value based on

13 observed multiples of share price, and they said they

14 did this based on 2010 and 2011 earnings per share of

15 comparable companies; yet they only disclose the

16 results of that analysis for 2010.  And it's

17 interesting, if you read the proxy and you see the

18 results of that analysis, it derives an implied equity

19 value of $2.69 to $9.16, which is a far cry of the

20 $38.

21          So it all sounds well and good, but

22 shareholders would like to see how that analysis

23 resulted for 2011.  And based on disclosed 2011

24 earnings per share, which are a lot different than

2010, shareholders -- or plaintiffs believe the
results would be a lot different and we believe that
that should be disclosed.

Another disclosure point is that the
board was told by Merrill Lynch that it was unlikely
that an all-cash bidder would come forward on a basis
higher than Fairfax's bid.  And in Fairfax's letter
brief to you this morning, Your Honor, they were
saying, "Well, we can't disclose what isn't there."

But, clearly, if I was a diligent
board member and my financial advisor were to tell me
that there's no -- you know, not likely that an
all-cash bidder is going to come forward with more
cash, I'd want to know why.  So presumably that advice
was given and that advice should be disclosed,
especially given the conflict with Fairfax's previous
history with Bank America, Merrill Lynch.  The
shareholders need to know exactly the basis for
Merrill Lynch's opinion on that matter.

And -- and then I previously mentioned
the issue of fees.  So those are the disclosure
points.  And the -- the burden for defendants -- we're
seeking very limited discovery.  We previously have
proffered some discovery requests.  We would likely

1  seek three depositions as well.  Given the harm if the

2  transaction goes forward without adequate disclosure,

3  we can't unscramble the egg.  And --

4              THE COURT:  Who do you think the three

5  depositions are going to be?

6              MR. LEVENTHAL:  We would like to

7  depose Mr. Zax, an advisor from Merrill, and someone

8  from the independent committee.

9              THE COURT:  Why don't you think you

10 need to depose the other guy, the CEO of the acquirer

11 who was the other person in the face-to-face meeting

12 with Zax during which he supposedly diverted merger

13 consideration and bargained for his own benefit?

14             MR. LEVENTHAL:  Well, we would like to

15 see -- I mean, we're trying to keep it targeted, and

16 we want to know the basis for information that the

17 board reached their decision in exercising their

18 fiduciary duties.

19             THE COURT:  All right.  You might want

20 to think about taking the CEO of the acquirer.

21             MR. LEVENTHAL:  Well, we would

22 certainly be happy to, Your Honor, if Your Honor was

23 so inclined to grant us that relief.

24             (Pause in the proceedings)

1            THE COURT:  Still your nickel.

2            MR. LEVENTHAL:  Still my nickel.

3    Well, unless you have further questions or unless my

4    cocounsel would like to chime in, I'm good for now.

5            THE COURT:  All right.  Thank you very

6    much.

7            MR. LEVENTHAL:  Thank you, Your Honor.

8            THE COURT:  Mr. Terrell.

9            MR. TERRELL:  Yes.  Thank you.

10            Your Honor, you have our letter

11    stating the reasons we oppose the motion to expedite.

12    And you're quite familiar with the standard.  And --

13    and there's no need for us to definitively argue the

14    strength and weaknesses of the points.

15            I would like to just in summary form

16    emphasize to the Court that the plaintiffs have

17    brought an extremely weak case; that, here, the

18    evidence shows arm's-length negotiations between

19    adverse parties, as it were, that resulted in a

20    back-and-forth, getting to $38 a share, which results

21    in a approximately 35 percent premium.

22            The terms in the merger agreement are

23    not at all out of line with Delaware standards.

24    There's a 2.75 percent termination fee, there's a

1  fiduciary out, and so forth.

2  　　　　　　The deal was announced approximately

3  30 days ago.  So consistent, as it turns out, with

4  Merrill's view that a competitive bid was not likely

5  to arise, there has been no other bidder or indication

6  of interest.

7  　　　　　　Likewise, Your Honor, we feel the

8  disclosure claims are extremely weak.  And consistent

9  with Delaware law, there is not an absolute

10  requirement that projections were apparently prepared

11  solely for the purpose of the banker to run a DCF

12  analysis.  And such projections were not done for any

13  other purpose, it appears.  And the work of the banker

14  was fully disclosed in this preliminary proxy that the

15  plaintiffs have.  It's about a three-page discussion

16  of the work by Merrill Lynch.

17  　　　　　　And I think that covers, frankly, all

18  the disclosure arguments that the plaintiff has

19  brought to Your Honor's attention.  Namely, it goes to

20  the process by which the banker evaluated it, the

21  banker's past experience with Fairfax.  And while it

22  doesn't go into the extent of the minutia that the

23  plaintiffs apparently seek, we believe that Delaware

24  law doesn't require that.

 1              And furthermore, in any event -- and
 2    I'll just finish on the point about timing.  In any
 3    event, the final proxy has not yet gone out.  The --
 4    the company has announced that it intends to hold the
 5    shareholders' vote on April 29.  And with that in
 6    mind, it expects to mail the final proxy at the end of
 7    this month or by the end of this month.  And we'll see
 8    in the final proxy whether, in fact, any of these
 9    claims with regard to disclosure are still at all
10    before the Court.
11              In essence, I think, Your Honor, we
12    have here a case where the plaintiff doesn't have
13    enough to bring at this stage expedition.  And there
14    certainly would be time next month, if after getting
15    the final proxy there seems to be anything different
16    that would allow the plaintiff to ask for expedition.
17              Thank you, Your Honor.
18              THE COURT:  Thank you, Mr. Terrell.
19    It's very helpful.
20              Mr. Lafferty?
21              MR. LAFFERTY:  Your Honor, I don't
22    believe I have anything else to add.  I think we join
23    in -- in -- in the Zenith defendants' opposition for
24    all the reasons that Mr. Terrell stated.

1          THE COURT:  Great.  Well, I appreciate

2     all the parties getting on the line promptly to deal

3     with the plaintiffs' application.

4          I'm going to grant the motion and

5     schedule a preliminary injunction hearing for April

6     22nd, which is one week in front of the voting date.

7          Having looked at the complaint and

8     reviewed the preliminary proxy, first I'll note that I

9     don't think the fact it's a preliminary proxy makes it

10    premature.  I think we have a bad habit -- we

11    sometimes have lapsed into a bad habit of getting

12    plaintiffs both going and coming, where if they sue

13    early on the preliminary, the defendants get to say

14    it's premature; and then if they wait for the

15    definitive, the defendants get to say that -- laches

16    and there's not enough time is left and, therefore,

17    the case shouldn't go forward.

18          I don't have any problem with letting

19    people sue on a preliminary.  The company ought to be

20    doing its best effort in the preliminary to address

21    all the disclosure issues, you know, not just sort of

22    putting something out and then fixing everything in

23    the definitive.

24          I understand there's an SEC comment

1    process; and, you know, there can be fights on down

2    the road as to whether disclosures were resulting from

3    SEC comment or whether the plaintiffs had a role in

4    them.  But I don't view the fact that we're only at

5    the preliminary proxy stage as any bar to scheduling.

6    In fact, I think that getting started now, when

7    we're -- we essentially have 30 days to get this done,

8    is the right way to go.

9              I do think that there are both

10   substantive claims and disclosure claims here that

11   need to be explored.  This is a situation where, at

12   least according to the complaint and the background of

13   the merger, you had a CEO that was way out in front.

14   You had a CEO that, I'm told in the opposition,

15   communicated verbally with his directors early on; but

16   at least according to the background of the merger,

17   the board seems to have been brought in late and in a

18   limited fashion.

19              There are allegations that during the

20   initial meetings the CEO bargained for price,

21   bargained for his own position in the follow-on

22   entity, and also bargained for the ability to

23   compensate and determine the compensation of senior

24   management.  That raises a colorable claim as to

1  whether the CEO, in fact, was engaged in steering; in

2  other words, steering for this bidder as opposed to

3  other bidders who might not give him the same freedom,

4  and whether the bidder -- whether the CEO was

5  potentially diverting merger consideration in the form

6  of value to himself and his team rather than value for

7  the stockholders.

8           It may well be that there is no basis

9  at all for those concerns.  It may well be that this

10 CEO was, in fact, acting properly as a fiduciary,

11 bargaining appropriately at arm's length and that

12 there was nothing untoward about this process and that

13 it was appropriately handled.  But those are not

14 things to be determined today.  And given the fact

15 that the CEO and his board chose to put themselves in

16 a position where the CEO got way out in front and it

17 was in essentially compromising meetings or

18 compromising meetings, which is essentially the type

19 of situation that merits exploration on a preliminary

20 injunction record.

21           Given the fact that Lyondell is out

22 there, the suggestion that the defendants have

23 offered, that a postclosing damages action is somehow

24 viable is not something that I find at all colorable.

1          In terms of the disclosure issues, I

2    do think that these plaintiffs have done a good job in

3    terms of identifying specific and targeted issues.

4    You know, as -- as in Lear, it may be that the CEO

5    negotiation question turns into a disclosure claim.

6    We will see.  Certainly I think that the lack of

7    projections is something that needs to be explored.

8          You know, nobody -- nobody cited the

9    Pure Resources-Netsmart view of projections, which is

10   certainly far closer to my own.  And I think that in

11   both CheckFree and Globis there were other extenuating

12   circumstances that were in play, such that those cases

13   should not be read as broadly as perhaps they are.

14          I also do have concerns about the

15   disclosure of the financial advisor's conflicts,

16   particularly in a situation where the board let its

17   CEO get out in front and is essentially relying for

18   process issues on what the CEO did and then a banker

19   coming in to bless everything with a fairness opinion.

20   I think in that type of situation -- again, there may

21   be nothing untoward about this at all.  It may well be

22   that this is a -- a -- a great deal in which all the

23   fiduciaries acted completely appropriately.  But at

24   least at this stage of the proceeding, these things

1  need to be explored.

2          On other matters, though, I would

3  encourage the plaintiffs to be far more restrained and

4  to really consider whether they need to address these

5  matters.  I'm not going to limit their ability to

6  pursue discovery on them; but I agree with Mr. Terrell

7  that the deal protection features, the no-shop, the

8  termination fee, none of those things look to me to be

9  anything untoward.

10          So but for these other factors

11  involved in the factual scenario, there's nothing

12  about the merger agreement or the terms that jump out

13  at me.  So the plaintiffs should think hard about

14  whether that aspect of their complaint is something

15  that they really want to press.

16          The other thing that I would suggest

17  to the plaintiffs is that this is something where I

18  think that the -- the record needs to be explored.

19  And particularly when you're dealing with meetings at

20  which there were two main participants, I don't think

21  the idea that you only depose one of those

22  participants is a good way to proceed.

23          And I would also very much encourage

24  Ms. Keener and her firm to have a meaningful role in

1    this case.  I think part of the recent unpleasantness

2    in another case was due to the fact that I don't think

3    that Delaware counsel was sufficiently involved in the

4    process.  And I know that you are appearing as

5    Delaware liaison counsel in this matter.  I don't

6    think that term diminishes in any way your role as the

7    Delaware lawyer on the case.  And I know that all the

8    members at your firm, you know, know how these things

9    are litigated and should be litigated.  So, as I say,

10   I would very much encourage you to take a meaningful

11   role in terms of this proceeding.

12              The only other thing I would say is, I

13   want the last brief two days before.  So let's say 4

14   o'clock on the 20th.  You all can work back from

15   there.  But I don't want people jamming the plaintiffs

16   and saying that their brief is due the day after the

17   last deposition.  People need to work equitably to

18   work out a briefing schedule that's fair to both

19   sides.  You're both going to start briefing this thing

20   as soon as we get off the phone.  And so the time

21   should be divided appropriately.  And if anybody has

22   any difficulties with scheduling or working something

23   out that's fair to both sides, you certainly know

24   where to find me.  And for an expedited matter like

1  this that is going forward on a -- on a one-month

2  schedule, you go to the top of my queue.

3                   So does anybody on the phone have any

4  questions about how this matter should go forward?

5                   MR. TERRELL:  Your Honor, it's Allen

6  Terrell.  I don't have any questions in light of

7  everything that Your Honor has so helpfully explained

8  to us.  I do have a question as to what you would

9  prefer with regard to a form of order.  I think some

10  of the points that you made with respect to the

11  scheduling and obviously the brief and the hearing

12  date, we could put in a form of order.  Would you like

13  that, with other dates agreed to, such as the opening

14  and answering brief?

15                  THE COURT:  Absolutely.  I think it

16  would be ideal if you and your counterparts could do

17  your usual good job in terms of working out a

18  scheduling order that sets an appropriate timetable

19  for the action.

20                  MR. TERRELL:  We will work on that,

21  Your Honor, and should be able to present it to you in

22  a matter of a few days.

23                  THE COURT:  Wonderful.  All right.

24  Well, again, I thank everyone for getting on the phone

this morning on short notice.  I know that you've got

a lot of work ahead of you.  But please have a good

rest of the day.

                  ALL COUNSEL:  Thank you, Your Honor.

                  (The proceedings concluded at 12:25

p.m.)

                        - - -

1                          <u>CERTIFICATE</u>

2

3                     I, NEITH D. ECKER, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, do hereby certify that the foregoing pages

6    numbered 3 through 19 contain a true and correct

7    transcription of the proceedings as stenographically

8    reported by me at the hearing in the above cause

9    before the Vice Chancellor of the State of Delaware,

10   on the date therein indicated.

11                     IN WITNESS WHEREOF I have hereunto set

12   my hand at Wilmington, this 22nd day of March 2010.

13

14

15                              /s/ Neith D. Ecker

16                     ------------------------------
                                Official Court Reporter
17                              of the Chancery Court
                                  State of Delaware
18

19

20   Certificate Number:  113-PS
     Expiration:  Permanent
21

22

23

24